**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO:_____- CIV

**CARLOS ORLANDO CABRERA,**

      **Plaintiff,**

v.

**Merrick Garland,** in his official capacity as **Attorney General, Alejandro Mayorkas,** in his official capacity as **Secretary of the United States Department of Homeland Security**, **Tracy Renaud,** in her official capacity as **Director, U.S. Citizenship and Immigration Services,** and **Emigdio Martinez**, in his official capacity as **Oakland Park Field Office Director, U.S. Citizenship and Immigration Services, Wendy Wilcox**, in her official capacity as **West Palm Beach Field Office Director, U.S. Citizenship and Immigration Services,** and **Michael Borgen**, in his official capacity as **District Director**, Tampa District (S23), **U.S. Citizenship and Immigration Services (USCIS)**,

      **Defendants.**

_____/

**COMPLAINT FOR DENIAL OF APPLICATION FOR ADJUSTMENT OF STATUS PURSUANT TO 5 U.S.C. § 706(2)(A)**

Plaintiff, **CARLOS ORLANDO CABERRA,** (hereinafter "**Plaintiff**" or "**Mr. Cabrera**"), through counsel, files this complaint, under 5 U.S.C. § 706(2)(A); 5 U.S.C. § 701 et seq., for the denial of his application for adjustment of status and alleges as follows:

**INTRODUCTION**

Plaintiff, Mr. Carlos Cabrera ("Mr. Cabrera"), is a citizen of Nicaragua. He has resided in the U.S. for over thirty-six (36) years. Mr. Cabrera was eleven (11) years old when he entered the U.S. without inspection with his mother and siblings on February 9, 1985. Beginning on November 16, 1987, Mr. Cabrera was provided multiple I-94 entry documents by the Miami Asylum Office, while

1

he was a derivative beneficiary of his father's pending asylum application. After many years in this country without status, the Plaintiff subsequently filed for adjustment of status based on an approved I-130 family petition by Plaintiff's mother. The Defendants denied Plaintiff's adjustment of status applications on February 15, 2018 (**Exhibit A**, Denial Decision #1) and again on September 10, 2019 (**Exhibit B**, Denial Decision #2), stating he did not provide proof of being inspected and admitted *or paroled* since one of the I-94 documents indicated he entered without inspection (EWI). **(Exhibit C,** I-94s**).** The Plaintiff seeks relief in the form of an order from this Honorable Court to have Defendants acknowledge the Plaintiff was paroled for the purposes of being able to apply for adjustment of status.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the present action pursuant to 28 U.S.C. § 1331 (federal question), and 1346(a)(2) (United States as defendant).

2. Venue is proper in the Southern District of Florida. Venue is properly with this Court pursuant to 28 U.S.C. § 1391(e) because the Plaintiff resides within the Southern District of Florida. *See also* 8 C.F.R. §336.9. Mr. Cabrera resides at 2233 Ridgewood Circle, Royal Palm Beach, FL 33411, within the jurisdiction of the Southern District of Florida.

3. This Court may grant relief pursuant to 5 U.S.C. §§702, 706 (judicial review of agency action); 5 U.S.C. § 701 et seq. (Administrative Procedure Act); 28 U.S.C. §1361 (the Mandamus Act), and 28 U.S.C. §1651 (the All Writs Act).

## PARTIES

4. Plaintiff, **Mr. Carlos Cabrera**, is a 47-year-old non-citizen who resides in West Palm Beach, Florida and has physically resided in the United States since February 9, 1985. The erroneous and unlawful denial of his adjustment of status applications by the **USCIS West Palm Beach Field Office and the USCIS Oakland Park Field Office**— which is within Defendants Martinez's,

Wilcox's and Borgen's area of responsibility— makes him the subject of this complaint.

5.      Defendant, **Merrick Garland,** in his official capacity as **Acting Attorney General** is being sued in his official capacity as the Acting Attorney General of the United States. In this capacity, he is responsible for the administration and enforcement of the laws of the United States. His mission is to enforce the law and defend the interests of the United States according to the law; to ensure public safety against threats foreign and domestic; to provide federal leadership in preventing and controlling crime; to seek just punishment for those guilty of unlawful behavior; and to ensure fair and impartial administration of justice for all Americans. His address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

6.      Defendant **Alejandro Mayorkas** is being sued in his official capacity as the Secretary of the Department of Homeland Security ("DHS"). In this capacity, he is responsible for the administration and enforcement of the immigration and adjustment of status laws. 8 U.S.C. § 1103(a). His address is Department of Homeland Security, U.S. Department of Homeland Security, Washington, D.C. 20528.

7.      Defendant **DEPARTMENT OF HOMELAND SECURITY ("DHS")** is the federal parent agency of the USCIS and agency responsible for the administration and enforcement of the country's immigration and adjustment of status laws.

8.      Defendant, **UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICE ("USCIS")**, which is a division of the Department of Homeland Security, is the federal agency responsible for the adjudication of adjustment of status applications. The USCIS is the successor agency to the Immigration and Nationality Service ("INS") in the area of adjustment of status adjudications.  See 8 C.F.R. § 336.9(b) ("The petition for review shall be brought against the Immigration and Adjustment of status Service").

9.      Defendant **Tracy Renaud,** is being sued in her official capacity as the Director of U.S.

Citizenship and Immigration Services, a component agency within the U.S. Department of Homeland Security. USCIS is the agency responsible for the adjudication of applications for adjustment of status. Her address is 20 Massachusetts Ave. NW, Washington, D.C. 20529.

10.     Defendant **Wendy Wilcox,** is being sued in her official capacity as the Field Office Director of the West palm Beach Field Office, United States Citizenship and Immigration Services. As Field Office Director, she is designated by the Secretary of Homeland Security to administer and enforce the immigration laws within West Palm Beach. One of the duties of USCIS is the processing of adjustment of status applications. She maintains her office at 9300 Belvedere Rd., Royal Palm Beach, FL 33411.

11.     Defendant **Emigdio Martinez,** is being sued in his official capacity as the Field Office Director of the Oakland Park Field Office, United States Citizenship and Immigration Services. As Field Office Director, he is designated by the Secretary of Homeland Security to administer and enforce the immigration laws within Oakland Park, FL. One of the duties of USCIS is the processing of adjustment of status applications. He maintains his office at 4451 N.W. 31st Ave., Oakland Park, FL 33309.

12.     Defendant, **Michael Borgen**, is sued in his official capacity as the District Director for the Tampa District (S23) of U.S. Citizenship and Immigration Services.  The USCIS Tampa District Office is headquartered in Tampa, Florida, and has jurisdiction over an area of responsibility covering the following field offices: (1) the West Palm Beach Field Office; (2) the Fort Myers Field Office; (3) the Tampa Field Office; (4) the Orlando Field Office; and (5) the Jacksonville Field Office. As District Director, he is designated by the Secretary of Homeland Security to administer and enforce the immigration laws within West Palm Beach. One of the duties of USCIS is the processing of adjustment of status applications. He maintains his office at 9300 Belvedere Rd., Royal Palm Beach, FL 33411.

## EXHAUSTION OF REMEDIES

13. As per *Darby* v. *Cisneros*, 509 U.S. 137 (1993), there are no available administrative remedies, or other remedies for review under the INA or its implementing regulations that require exhaustion before pursuing judicial review under the APA in this case.

## LEGAL BACKGROUND

14. The Immigration and Nationality Act ("INA") provides, in general, for the admission, expulsion, regulation, and adjustment of status of noncitizens. 8 U.S.C. § 1101 et seq.

15. To qualify for adjustment of status, a non-citizen must show, that they were "inspected and admitted *or paroled* into the United States, and they must (1) apply for adjustment, (2) [show they are] eligible to receive an immigrant visa and [are] admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed" 8 U.S.C. § 1255(a). (*emphasis added*)

16. Between the 1950s and 1970s, parole had long been used by the Attorney General pursuant to the Immigration and Nationality Act (INA) §212(d)(5) as a method to permit refugees be present within the United States, and adjust their status, many of whom were refugees due to wars in their countries.[1] *See* Bruno, Andorra; *Immigration Parole*, Congressional Research Service, October 15, 2020.

17. However, Congress placed a limit on the Attorney General's parole authority regarding refugees through the Refugee Act of 1980, wherein the term "refugee" and manner of admission were delineated in a way that parole would only be appropriate if someone were *not* being admitted into the U.S. as a refugee pursuant to section 207 of the (INA). The Attorney General would have to "determine that compelling reasons in the public interest" applied to the non-citizen for them to be

---

[1] Available at: https://crsreports.congress.gov/product/pdf/R/R46570, pgs. 5-6, 11, 16-18, 23.

granted parole if they were not admitted as a refugee. *Id.*

18. Beginning in 1979, many Nicaraguans fled to the U.S. due to the ensuing war between the communist-backed Anastasio Somaza dictatorship and the counter-revolutionary Sandinistas (Contras). Between 1981 and 1987 the Regan administration provided funding and military aid to the Contras allegedly for the advancement of democracy in Nicaragua.[2] *See* Office of Inspector General, *Appendix A: Background on United States Funding of the Contras*.

19. The parole regulations of the Refugee Act of 1980 continued to apply in 1987 when Attorney General Edwin Meese III issued an immigration policy stating an estimated 200,000 "Nicaraguans will be permitted to remain in the United States 'for the present'… [and that] Every qualified Nicaraguan seeking work authorization will be entitled to one…"[3] *See* Washington Post; *Meese Signs Order Giving Nicaraguans Haven in U.S.*, July 10, 1987. Work authorization was a common benefit of public interest parolees and this policy announcement indicated the Attorney General was using his discretion to grant parole to Nicaraguans.[4]

20. This policy announcement was made for two specific reasons. First, the week prior to this announcement, the Supreme Court issued a ruling in a case of a Nicaraguan woman stating the asylum standard under the 1980 Refugee Act was a "well-founded fear," of persecution and not "clear probability" as the government had been arguing.[5] *See* Miles, Martha A, and Rand Herron, Caroline, *The Nation; Door Opens Wider for Nicaraguans*, July 12, 1987.

21. The second reason for the Attorney General's policy shift toward Nicaraguans was because the Iran-Contra Scandal had already been publicized and the Regan administration needed to save face with lawmakers who had been trying to get help for Nicaraguans seeking refuge in the U.S. The

---

[2] Available at: https://oig.justice.gov/sites/default/files/archive/special/9712/appa.htm
[3] Available at: https://www.washingtonpost.com/archive/politics/1987/07/09/meese-signs-order-giving-nicaraguans-haven-in-us/3041bc0a-814f-4b69-bdd1-2a7e390d0d3d/
[4] *See* Bruno, Andorra; *Immigration Parole*, Congressional Research Service, October 15, 2020, pg. 17.
[5] Available at: https://www.nytimes.com/1987/07/12/weekinreview/the-nation-door-opens-wider-for-nicaraguans.html

Iran-Contra Scandal involved the sale of arms to Iran in exchange for American hostages and illegal diversion of those funds of the sale of arms to the anti-communist Contra fighters in Nicaraguan.[6]. See Fritz, Sara and Tumulty, Karen; *The Iran-Contra Hearings: Meese Defends His Iran Inquiry: Didn't Immediately View Affair as a Criminal Case, He Testifies*, July 29, 1987. The diversion of funds was directly in contrast to an amendment passed in Congress prohibiting the Regan administration from directly funding war efforts in Nicaragua.[7] *See* History.com, *Iran-Contra Connection Revealed*, February 9, 2010.

22. On November 19, 1997, more than ten (10) years after the Meese policy announcement, Congress authorized the passage of the Nicaraguan Adjustment and Central American Relief Act ("NACARA") to ameliorate the massive backlog of Nicaraguan asylum cases that had yet to be adjudicated and other public interest reasons.

23. NACARA allowed Nicaraguans to file for adjustment of status until April 2000. Pub. L. No. 105-100, Tit. II, 111 Stat. 2193 (Nov. 19, 1997). One document applicants could provide as proof of physical presence was an I-94 showing the applicant was inspected and admitted *or paroled*. 8 C.R.F. 1245.13 (e)(12). (*emphasis added*).

## FACTS

24. The Plaintiff, Mr. Carlos Cabrera, entered the U.S. without inspection on February 9, 1985, with his mother, Mercedes Cabrera ("Mercedes").

25. The Plaintiff was only eleven (11) years old when he was brought to the U.S. (**Exhibit C,** Plaintiff's I-94).

26. The Plaintiff's father, Mr. Francisco Cabrera ("Francisco"), lawfully entered the U.S. with a

---

[6] Available at: https://www.latimes.com/archives/la-xpm-1987-07-29-mn-4386-story.html
[7] Available at: https://www.history.com/this-day-in-history/iran-contra-connection-revealed

visitor visa and applied for asylum on February 9, 1987. (**Exhibit D,** Copy of Francisco's Asylum Application).

27. Francisco included his wife and three children, including the Plaintiff, in his asylum application as derivative beneficiaries to his asylum application. (**Id.**).

28. Plaintiff and his family attended the asylum interview at the Miami Asylum Office on November 16, 1987. The Asylum Officer forwarded the application to the relevant offices for a decision. (**Exhibit E,** Asylum Interview Notice Notes).

29. The Asylum Officer also issued an I-94 parole to the Plaintiff with employment authorization until November 16, 1988. (**Exhibit C,** Plaintiff's I-94). The I-94 parole was renewed in subsequent years.

30. For *eleven (11) years*, Defendants failed to adjudicate Francisco's asylum application and the Plaintiff "aged out" of derivative beneficiary status. (**Exhibit F,** INS Age-Out Notice).

31. The INS Age-Out Notice dated February 20, 1998, stated the Plaintiff could submit his own asylum application since he would no longer be covered as a derivative beneficiary of his father's pending asylum application. (**Id**).

32. NACARA was also a newly available form of relief by the time Plaintiff aged out of derivative status from his father's asylum application in 1998.

33. However, the Plaintiff did not apply for asylum or NACARA based on the advice of an attorney, due to an arrest he had on July 14, 1993. The Plaintiff was in Byron, Georgia, and was arrested for allegedly possessing less than one ounce of marijuana and drug related objects. (**Exhibit G**, Faulty Criminal Record).

34. However due to a clerical error by a government employee at the Byron municipal court, the Plaintiff's arrest was logged in the Georgia criminal system as a felony conviction even though

the disposition stated was a bond forfeiture. (**Id**).

35. As a result of the Plaintiff's arrest and this erroneously logged felony conviction record, he was unable to avail himself of asylum, NACARA, or Nicaraguan Temporary Protected Status.

36. On April 27, 2000, the Plaintiff's parents were granted adjustment of status through NACARA (**Exhibit H,** Parents' Lawful Permanent Resident Cards showing NACARA adjustment).

37. Defendants finally took action on Francisco's asylum application, fifteen (15) years after submission, on September 28, 2002, dismissing the application due to Francisco already obtaining resident status through NACARA. (**Exhibit I,** Asylum Office Dismissal Notice dated September 28, 2002).

38. On March 3, 2003, the Plaintiff's parents subsequently filed two I-130 Petition for Alien Relative ("family petition") on the Plaintiff's behalf in an effort to begin the process of finally legalizing the Plaintiff's status in the U.S. (**Exhibit J,** I-130 Receipt Notices).

39. On March 1, 2006, Plaintiff's parents became Naturalized citizens of the United States. (**Exhibit K,** Parents' Naturalization Certificates)

40. Four (4) years after submission, on March 29, 2007, Mercedes' family petition for the Plaintiff was finally approved. Francisco's family petition was never adjudicated. (**Exhibit L,** Case Status of Family Petitions)

41. The Plaintiff finally filed his application for adjustment of status on May 2, 2016, which was forwarded to the USCIS West Palm Beach Field Office for adjudication. (**Exhibit M,** I-485 Adjustment of Status Receipt)

42. On December 2, 2016, Plaintiff received a Request for Evidence only asking for certified criminal records regarding his arrest on July 14, 1993. (**Exhibit N**, I-485 Request for Evidence).

43. In response to this request for evidence, Plaintiff submitted proof that the arrest was improperly

filed as a felony conviction and that his record had been corrected with the Federal Bureau of Investigation. (**Exhibit O, Response to Request for Evidence**).

44. After waiting for more than a year for a response, the Defendants unreasonably denied the Plaintiff's adjustment of status application on February 15, 2018, alleging he was restricted from adjustment of status because his I-94 states he Entered Without Inspection (EWI). (**Exhibit A**, Denial Decision #1).

45. Plaintiff then re-filed his adjustment of status application. (**Exhibit P,** I-485 Adjustment of Status Receipt #2)

46. Plaintiff's second adjustment of status application was scheduled for interview this time at the USCIS Oakland Park Field Office (**Exhibit Q,** I-485 Interview Notice #2).

47. The Interviewing Officer inspected Plaintiff's pristine I-94, and informed Plaintiff that the only issue with the file appeared to be that the mother's I-130 was very old and might not be available for review and that the Plaintiff may need to provide proof of his mother's name change.

48. Instead, Defendants unreasonably denied Plaintiff's adjustment of status application again, alleging that the I-94 issued by the INS to Plaintiff did not constitute an admission or parole for the purposes of adjustment of status because the duplicate I-94 states on its face that Plaintiff "Entered EWI" (without inspection). Thus, because Plaintiff was not allegedly admitted or paroled, he was ineligible for adjustment of status (**Exhibit B**, Denial Decision #2).

49. Seeing that USCIS was refusing to acknowledge their own issuance of a document showing Plaintiff was in fact inspected and *paroled* into the country, Plaintiff decided to bring this action.

50. Defendants should acknowledge their issuance of parole to the Plaintiff, acknowledge that his failure to maintain lawful status was through no fault of his own, or his parents, considering Defendants failed to adjudicate Francisco's asylum application in a timely manner, to wit, 15 years.

## CLAIM FOR RELIEF

## COUNT I
## Violation of Immigration and Nationality Act and Administrative Procedures Act

51.     The allegations contained in paragraphs 1 through 50 above are repeated and realleged as though fully set forth herein.

52.     The Plaintiff has a right to judicial review of agency action. 5 U.S.C. §§702, 706; 5 U.S.C. § 701 et seq. (Administrative Procedure Act);

53.     The decisions of USCIS were incorrect factually and as a matter of law. The Board of Immigration Appeals precedent holds that determining whether a person has been paroled or not, is a matter of substance over form. *Matter of O-*, 16 I. & N. Dec. 344 (BIA 1977).

54.     The evidence in the record establishes that the Plaintiff was a minor child when he entered the U.S. with his mother on February 9, 1985. The record also shows Defendants issued Plaintiff his first I-94 in 1987 after the father's asylum interview concluded and while the application remained pending.

55. In 1987 Attorney General Meese exercised his broad discretion to issue parole to Nicaraguans awaiting or seeking to reopen asylum adjudications as a public interest matter. INA § 212(d)(5). The Iran-Contra Scandal incentivized a policy shift from the Attorney General regarding Nicaraguans at that time.  Defendants renewed Plaintiff's parole as a result of this policy.

56. The record is clear that for more than eleven (11) years, Defendants failed to adjudicate the asylum application of Plaintiff's father where Plaintiff was included as a derivative beneficiary.

57.  Defendants' undue delay in adjudicating Francisco's asylum application, severely impacted Plaintiff's opportunity to adjust his status in this country even to this day, despite the fact that Plaintiff entered as a minor child.

58. Now, Defendant's refusal to acknowledge their issuance of parole to the Plaintiff piles on to their egregious acts, further harming Plaintiff and adding to his suffering. 5 U. S. C. § 702.

59. The Defendant's denials of the Plaintiff's applications for permanent residence amounts to agency action that is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law."  § 706(2)(A).

60. As such, the Plaintiff is entitled to have the denials of his adjustment of status applications reviewed by this Court, and to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. §§702, 706; 5 U.S.C. § 701 et seq. (Administrative Procedure Act); 28 U.S.C. §1361 (the Mandamus Act), and 28 U.S.C. §1651 (the All Writs Act).

## COUNT II

61. The allegations contained in paragraphs 1 through 61, above are repeated and realleged as though fully set forth herein.

62. To the extent that the Government's actions in this matter are not supported by substantial justification, attorney's fees are appropriate. The Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412 (the "EAJA"), provides for the award of costs and attorney's fees to a prevailing party in litigation against the United States or one of its agencies. Plaintiff respectfully requests that this Court grants "EAJA" costs and fees as provided by statute.

63. The EAJA has been invoked to justify the award of attorney fees and costs in immigration cases. See, e.g., ***Commissioner, Immigration and Adjustment of status Service v. Jean***, 496 U.S. 154 (1990); accord ***Dabone v. Thornburgh***, 734 F. Supp. 195 (E.D. PA 1990) and ***Harriott v. Ashcroft***, 277 F. Supp. 2d 538, 545-46 (E.D. Pa. 2003).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court either:

(1) Assume jurisdiction over this matter;

(2) order the hearing take place in this matter;

(3) review de novo Plaintiff's application for adjustment of status and grant his adjustment of status;

(4) Plaintiff also requests that the Court award Plaintiff his costs and reasonable attorney's fees in this action as provided for by the Equal Access to Justice Act, 28 U.S.C. § 2412, or other statute; and

(5) Grant such further relief that this Honorable Court may deem just and proper.

Dated: April 7, 2022

Respectfully submitted,

**/s/ STEFANIE YVONNE CRESPO**
Florida Bar No. 103127
**DEFENSA LAW, LLC**
5401 W. Kennedy Blvd., Suite 100
Tampa, FL 33609
Tel: (754) 400-1476
Fax: (888) 518-5222
Stefanie@DefensaLaw.com

*Attorney for Plaintiff*